# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **SANDRA J. JACKSON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:04cv00123 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

Plaintiff, Sandra J. Jackson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 1:04-cv-00123-PMS   Document 18   Filed 08/23/05   Page 1 of 21   Pageid#: 69

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jackson protectively filed her applications for DIB and SSI on or about March 28, 2003, alleging disability as of June 22, 2002, based on bursitis, severe muscle spasms, severe pain, depression and anxiety attacks. (Record, ("R."), at 57-59, 76, 105, 340-44.) Jackson's claims were denied both initially and on reconsideration. (R. at 29-33, 34, 36-38, 345-47.) Thereafter, Jackson requested a hearing before an administrative law judge, ("ALJ"). (R. at 42.) A hearing was held on March 16, 2004, at which Jackson was represented by counsel. (R. at 352-412.)

By decision dated April 30, 2004, the ALJ denied Jackson's claims. (R. at 17-26.) The ALJ found that Jackson met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 25.) The ALJ found that Jackson had not engaged in substantial gainful activity since June 22, 2002. (R. at 25.) The ALJ also found that Jackson had a severe impairment, namely degenerative disc disease, but he found that Jackson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) The ALJ further found that Jackson's

Case 1:04-cv-00123-PMS   Document 18   Filed 08/23/05   Page 2 of 21   Pageid#: 70

allegations regarding her limitations were not totally credible. (R. at 25.) The ALJ concluded that Jackson had the residual functional capacity to perform light work[1] that required no climbing of ladders, ropes or scaffolds and that allowed for frequent postural adaptation. (R. at 25.) Based on Jackson's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Jackson could perform her past relevant work. (R. at 25.) Nonetheless, the ALJ further found that Jackson could perform jobs existing in significant numbers in the national economy, including those of a cashier, a file clerk and a grader/sorter. (R. at 25.) Thus, the ALJ found that Jackson was not under a disability as defined by the Act and was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued this decision, Jackson pursued her administrative appeals, (R. at 12), but the Appeals Council denied her request for review. (R. at 6-9.) Jackson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on Jackson's motion for summary judgment filed March 28, 2005, and on the Commissioner's motion for summary judgment filed May 2, 2005.

## II. Facts and Analysis

Jackson was born in 1968, (R. at 57), which classifies her as a "younger person"

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2005). She has a tenth-grade education and later received her general equivalency development, ("GED"), diploma. (R. at 82, 360.) Jackson has past work experience as a fast food employee, a sewing machine operator and a convenience store attendant. (R. at 360-66.)

At her hearing, Jackson testified that she slipped and fell at work on June 20, 2000, injuring her lower back. (R. at 366-67.) She stated that she again fell on March 17, 2002, which caused inflammation and muscle spasms. (R. at 367.) Jackson testified that she stopped working on June 22, 2002, because she "could not stand anymore of the pain." (R. at 367.) She stated that she experienced low back and hip pain that radiated into her right leg. (R. at 368.) Jackson testified that she experienced constant pain, exacerbated by any activity. (R. at 368-69.) She further stated that her right leg gave way three to four times per week, causing her to fall. (R. at 369-70.) She stated that bending, stooping and lifting exacerbated her pain. (R. at 369.)

Jackson testified that she obtained pain relief by "[l]ying very still and flat on [her] stomach on the floor." (R. at 371.) She stated that she could not lie on her back due to knots caused by muscle spasms. (R. at 371-72.) Jackson testified that she had to lie on the floor for a total of approximately three to four hours daily. (R. at 372.) Jackson also testified that she experienced anxiety and depression. (R. at 374.) She stated that she experienced daily anxiety attacks for the previous three months, during which she could not breathe, had hot sweats and, sometimes, cried uncontrollably. (R. at 374, 386-87.) She stated that these attacks lasted approximately 15 to 30 minutes. (R. at 386.) She stated that following these anxiety attacks, she felt "dead." (R. at 374.) Jackson testified that she took medications for anxiety and depression and was,

-4-

at that time, seeking counseling. (R. at 375.) She stated that her hands sweated profusely due to her nerves. (R. at 376.) Jackson stated that her energy was low, her appetite was decreased and she had difficulty sleeping. (R. at 376.) She stated that she was awakened by muscle spasms. (R. at 376.) Jackson further stated that she had memory difficulties. (R. at 376-77.) She stated that medications and counseling did not help her mental impairments. (R. at 388.)

Jackson described a typical day as taking a very hot bath to loosen her joints, straightening up around her house and picking her daughter up from school. (R. at 377, 383-84.) Other than that, she stated that she stayed at home. (R. at 377.) Jackson testified that she wrote poetry, but had not done so since she broke her wrist in January 2004. (R. at 370, 388.) She stated that she did not drive on the interstate because it caused panic attacks. (R. at 377-78.) Jackson stated that her housemate took care of all of the household chores except for straightening her own room and her daughter's room. (R. at 384.) She described her average pain as a "dull toothache." (R. at 385.)

James Williams, a vocational expert, also was present and testified at Jackson's hearing. (R. at 389-412.) Williams was first asked to consider a hypothetical individual of Jackson's age, education and past work experience, who could perform light work, who could frequently climb ramps and stairs, who could frequently balance, stoop, kneel, crouch and crawl, but who should never climb ladders, ropes and scaffolds. (R. at 393-94.) Williams testified that such an individual could perform the jobs of a fast food worker, a sewing machine operator, an inspector, a cashier, a file clerk, and a grader/sorter, all at the light level of exertion and all

existing in significant numbers in the national economy. (R. at 394-95.) Williams testified that an individual who required an hour break in the morning and an hour break in the afternoon in addition to the normal workday breaks would not be able to work. (R. at 396.) Williams further testified that an individual who had an impaired dominant hand still in the process of healing, should not be working. (R. at 411.)

In rendering his decision, the ALJ reviewed records from Heartland Rehabilitation Services; Dr. Murray E. Joiner Jr., M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; Wythe Medical Associates; Dr. Robert B. Stephenson, M.D.; Mount Rogers Mental Health Center; Brock Hughes Free Clinic; Your Bodyworks; and West Ridge Orthopaedic Specialists. Jackson's counsel also has submitted a report from Cathye Griffin Betzel, Psy.D., a licensed psychologist, for this court's consideration.

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

-6-

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 30, 2004, the ALJ denied Jackson's claims. (R. at 17-26.) The ALJ found that Jackson met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 25.) The ALJ found that Jackson had not engaged in substantial gainful activity since June 22, 2002. (R. at 25.) The ALJ also found that Jackson had severe impairments, namely degenerative disc disease, but he found that Jackson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) The ALJ further found that Jackson's allegations regarding her limitations were not totally credible. (R. at 25.) The ALJ concluded that Jackson had the residual functional capacity to perform light work that required no climbing of ladders, ropes or scaffolds and that allowed for frequent postural adaptation. (R. at 25.) Based on Jackson's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Jackson could perform her past relevant work. (R. at 25.) Nonetheless, the ALJ further found that Jackson could perform jobs existing in

Case 1:04-cv-00123-PMS   Document 18   Filed 08/23/05   Page 7 of 21   Pageid#: 75

significant numbers in the national economy, including those of a cashier, a file clerk and a grader/sorter. (R. at 25.) Thus, the ALJ found that Jackson was not under a disability as defined by the Act and was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

-8-

In her brief, Jackson first argues that the ALJ erred in his physical residual functional capacity finding, given her combination of impairments, including back pain, leg pain and hip pain. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6.) For the following reasons, I find that the ALJ's physical residual functional capacity finding is supported by substantial evidence.

I first note that the record consistently reveals only mild findings. For instance, in June 2000, Jackson fell while working, but x-rays revealed no fracture. (R. at 257, 306.) She was diagnosed with lower back pain and a contusion and was treated with Advil and Darvocet. (R. at 241, 258.) In July 2000, Jackson complained of hip pain. (R. at 240.) Her diagnosis remained unchanged, and she was treated with Tylenol 3. (R. at 240.) On July 10, 2000, a CT scan of Jackson's lumbar spine revealed mild circumferential disc bulge at the L4-L5 level and mild broad based disc bulge at the L5-S1 level. (R. at 255, 307-08.) Later that month, Jackson complained of hip pain, back pain and spasms. (R. at 239.) She was diagnosed with back pain and disc problems, and physical therapy was recommended. (R. at 239.) On July 25, 2000, Jackson reported bilateral radiculopathies in the legs. (R. at 252, 303.) She was diagnosed with low back pain, and physical therapy was again recommended. (R. at 252, 303.) The following day, Jackson's complaints and diagnoses remained the same. (R. at 238.) She was prescribed Relafen. (R. at 238.)

Physical examinations also consistently yielded mild findings. In August 2000, Dr. Ralph O. Dunker, M.D., a neurosurgeon, reported that Jackson had symmetric deep tendon reflexes, straight leg raising was negative bilaterally and pinprick perception was equal except for the anterior thigh on the right. (R. at 250.) Dr.

Dunker reviewed Jackson's CT scan, noting that she had no central canal stenosis, neural foraminal stenosis or herniated disc. (R. at 250.) Thus, he concluded that Jackson was not a surgical candidate, and he opined that her back pain was unrelated to her minor disc findings. (R. at 250.) Dr. Dunker diagnosed lumbosacral strain or sacroilitis. (R. at 250.) Later that month, Jackson was diagnosed with a bulging disc and lower back pain. (R. at 235.)

On September 26, 2000, Jackson saw Dr. Robert B. Stephenson, M.D., noting that her back pain was "somewhat better." (R. at 267.) She further noted that Celebrex, Ultram and Skelaxin were helpful. (R. at 267.) A physical examination revealed tenderness at the L5-S1 level of the spine, the right posterior superior iliac spine, the SI joint, the right sciatic notch and the greater trochanter. (R. at 267.) Straight leg raising was mildly positive on the right, and Jackson exhibited normal strength in the lower extremities bilaterally. (R. at 267.) Dr. Stephenson diagnosed improved low back strain and right SI joint strain and recommended chiropractic treatment. (R. at 267.) On November 13, 2000, Jackson noted some improvement in her low back pain, but continued radiation into the right hip and lower extremity. (R. at 266.) She reported that chiropractic treatment had been "very helpful," and she noted that her medications were helpful. (R. at 266.) A physical examination revealed an essentially full range of motion of the low back. (R. at 266.) Jackson was diagnosed with improved low back strain with pain radiating to the right hip and lower extremity. (R. at 266.) She received a trigger point injection, after which she reported mild improvement. (R. at 265-66.) A physical examination on December 7, 2000, revealed an essentially full range of motion in all planes of the thoracolumbar spine. (R. at 265.) Straight leg raising was negative bilaterally, but Jackson exhibited some

-10-

tenderness to palpation of the right parascapular musculature. (R. at 265.) She was diagnosed with stable low back strain with pain radiating to the right hip and right parascapular muscle strain. (R. at 265.)

On January 15, 2001, Jackson reported no improvement with physical therapy or chiropractic treatment. (R. at 264.) However, Dr. Stephenson noted that she moved normally about the examining room, exhibited a good range of motion of the hips and straight leg raising was negative. (R. at 264.) X-rays of the pelvis showed no bony abnormalities, and an MRI of the lumbar spine yielded normal results. (R. at 264, 328.) Dr. Stephenson diagnosed exacerbation of low back strain with bursitis involving the right posterior superior iliac spine, as well as right trochanteric bursitis. (R. at 264.) Jackson received another trigger point injection. (R. at 264.)

On May 1, 2001, Jackson saw Dr. Murray Joiner Jr., M.D., for an evaluation of her low back pain.[2] (R. at 268-70.) She again saw Dr. Joiner on June 14, 2001, stating that she "may be a little better." (R. at 206.) A spinal examination revealed decreased lumbar lordosis and tenderness and spasms on the right at the L4-L5 level. (R. at 206.) Jackson exhibited increased tenderness with palpation over the right SI joint and diffuse right gluteal tenderness and spasms with multiple diffuse trigger points. (R. at 206.) Her deep tendon reflexes were 2/4, a sensory examination was intact and her strength was 5/5 throughout. (R. at 206.) Dr. Joiner diagnosed right SI dysfunction/pain, resolving left SI dysfunction/pain, reflex lumbar spasms and pain and right gluteal spasms and pain. (R. at 206.) She received multiple trigger point

---

[2]The page in the record containing the pertinent findings from this evaluation are largely illegible.

-11-

injections in the right hip.  (R. at 207.)  On August 9, 2001, Jackson again reported that medication seemed to be helping.  (R. at 202.)  A spinal examination revealed no bony abnormalities and decreased lumbar lordosis.  (R. at 202.)  Minimal paraspinal tenderness was noted, but no SI area tenderness was present.  (R. at 202.)  The remainder of her examination remained unchanged.  (R. at 202.)  Dr. Joiner diagnosed lumbar myalgia, resolved right SI dysfunction/pain and persistent right gluteal spasms and pain.  (R. at 202.)  Jackson received six gluteal trigger point injections.  (R. at 202.)  On September 6, 2001, her diagnoses remained the same and she was prescribed Toradol and Robaxin.  (R. at 201.)  On October 4, 2001, Jackson was diagnosed with right SI dysfunction, chronic lumbar and gluteal spasm and pain, right gluteal spasm and pain and right trochanter bursitis.  (R. at 200.)  By October 18, 2001, Jackson reported some improvement with Robaxin and physical therapy.  (R. at 199.)  She received more trigger point injections.  (R. at 199.)  Again, on November 1, 2001, Jackson stated that she was doing better, and Dr. Joiner noted that her problems were resolving.  (R. at 198.)  He administered more trigger point injections. (R. at 198.)

On October 2, 2001, Jackson exhibited diffuse muscular tenderness mainly on the right side of the low back extending down into the right gluteal and lateral right hip region with localized pain over the right greater trochanter.  (R. at 263.)  However, she exhibited a full range of motion of the low back, no spasm was noted, a hip examination was benign bilaterally and straight leg raising was negative.  (R. at 263.)  Localized pain over the right SI joint was noted.  (R. at 263.)  Dr. Stephenson diagnosed chronic low back/right SI joint strain with right gluteal/hip strain and right trochanteric bursitis.  (R. at 263.)  Jackson was advised to continue using a

-12-

transelectrical nerve stimulation, ("TENS"), unit and attending physical therapy. (R. at 263.) On December 13, 2001, Jackson reported a dramatic increase in pain. (R. at 195.) However, Dr. Joiner noted that she was in no acute distress, although she walked with a hysterical gait. (R. at 195.) A spinal examination revealed no palpable bony abnormalities or pathological curves. (R. at 195.) Jackson had decreased lordosis and no SI tenderness. (R. at 195.) She had a good range of motion, deep tendon reflexes were 2/4 and her sensory examination was intact. (R. at 195.) Dr. Joiner diagnosed resolving lumbar myalgia and resolved SI dysfunction/pain. (R. at 195.) Despite Jackson's reported exacerbation of pain, Dr. Joiner noted significant objective improvement in her overall examination. (R. at 195.) He opined that she had reached maximum medical improvement. (R. at 196.) Physical therapy was discontinued, and she was advised to discontinue all medications except for Ultracet. (R. at 196.)

On March 7, 2002, a spinal examination again revealed no palpable bony abnormalities and increased lordosis. (R. at 191.) Straight leg raising was negative bilaterally. (R. at 191.) Jackson was diagnosed with mild exacerbation of lumbar and right gluteal myalgia and mild right SI joint dysfunction and pain. (R. at 191.) She was prescribed Toradol and Skelaxin. (R. at 191, 194.) On April 4, 2002, Jackson reported that the trigger point injections helped for approximately one week. (R. at 188.) She also reported falling at work a couple of weeks previously, which exacerbated her pain. (R. at 188.) Jackson stated that her medications did not seem to help since this fall. (R. at 188.) An examination of Jackson's extremities revealed no signs of acute or chronic trauma. (R. at 188.) A spinal examination revealed tenderness on palpation of the right SI joint and tenderness along the bilateral

-13-

paraspinals from the L3 to S1 levels. (R. at 188.) She also exhibited tenderness with increased tone on palpation of the bilateral glutei. (R. at 188.) Straight leg raising was negative bilaterally, her deep tendon reflexes were 2/4 with the exception of the right patella, which was possibly 1/4, and her sensory examination was intact. (R. at 188.) She was diagnosed with exacerbation of chronic lumbar and gluteal spasms and pain status post work-related incident, exacerbation of right SI joint dysfunction and pain status post work-related incident and right foot dysesthesias with possible decreased right patellar reflex, rule out radicular process. (R. at 189.) She received a trigger point injection, was prescribed Bextra and was given a Medrol dosepack. (R. at 189-90.)

On April 5, 2002, another lumbar spine MRI was again normal. (R. at 187, 327.) By April 11, 2002, Jackson noted that her medications were working much better. (R. at 186.) On June 13, 2002, she reported doing "pretty good," except for some burning in the right low back and buttock with radiation. (R. at 184.) A physical examination revealed tenderness along the right flank area with no discrete costovertebral angle, ("CVA"), tenderness. (R. at 184.) She also exhibited tenderness on palpation of the right lumbar paraspinals and right glutei. (R. at 184.) Straight leg raising was negative bilaterally, deep tendon reflexes were 2/4 and Jackson's sensory examination was intact. (R. at 184.) She was diagnosed with exacerbation of right low back and gluteal spasms and pain. (R. at 184.) By October 28, 2002, Jackson reported that Ultram "really seem[ed] to help." (R. at 181.) Spinal and neurological examinations remained unchanged. (R. at 181.) Jackson was diagnosed with exacerbation of right lumbar and gluteal spasms and pain and mild right SI joint dysfunction and pain. (R. at 181, 183.) She received more trigger point injections.

-14-

(R. at 181, 183.) On May 21, 2003, Jackson reported significantly decreased pain with trigger point injections and requested that these be repeated. (R. at 178.) Her spinal and neurological examinations remained essentially unchanged. (R. at 178.) Jackson was diagnosed with exacerbation of right lumbar spasms and pain and exacerbation of right gluteal spasms and pain. (R. at 178.) Dr. Joiner administered more trigger point injections and prescribed Pamelor. (R. at 178-79.)

On February 16, 2004, Jackson reported that her right leg gave way approximately once every two weeks. (R. at 300.) With regard to Jackson's right knee, Dr. Joiner made the same findings, in addition to finding no instability or crepitus. (R. at 300.) Spinal and neurological examinations again remained unchanged. (R. at 301.) Jackson was diagnosed with exacerbation of chronic right lumbar spasms and pain, chronic mild right SI joint dysfunction and pain, exacerbation of right gluteal spasms and pain and exacerbation of right lower extremity pain and dysesthesia with reported give away, rule out radicular process. (R. at 301.) She received another trigger point injection. (R. at 301.)

In addition to mild findings on physical examinations, I note that Jackson reported on several different occasions, as outlined above, that her various medications and treatments helped to improve her condition. It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 986).

I further note that the ALJ's physical residual functional capacity finding is supported by the state agency physicians. On May 29, 2003, Dr. Richard M. Surrusco, M.D., found that Jackson could perform light work. (R. at 210-19.) He

further found that Jackson could never climb ladders, ropes or scaffolds, but could frequently balance, stoop, kneel, crouch and crawl. (R. at 212.) Dr. Surrusco imposed no manipulative, visual, communicative or environmental restrictions on Jackson. (R. at 213-14.) This assessment was affirmed by Dr. Michael J. Hartman, M.D., another state agency physician, on July 23, 2003. (R. at 217.)

I next note that the objective medical evidence of record supports the ALJ's physical residual functional capacity finding. As mentioned above, on July 10, 2000, a CT of Jackson's lumbar spine revealed mild circumferential disc bulge at the L4-L5 level and mild broad based disc bulge at the L5-S1 level. (R. at 255, 307-08.) The following month Dr. Dunker specifically noted that the CT scan showed no central canal stenosis, neural foraminal stenosis or herniated disc. (R. at 250.) On January 15, 2001, x-rays of the pelvis showed no bony abnormalities and an MRI of the lumbar spine yielded normal results. (R. at 328.) On April 5, 2002, an MRI of the lumbar spine was normal. (R. at 187, 327.)

Finally, Jackson's activities of daily living support the ALJ's physical residual functional capacity finding. At her hearing, Jackson testified that she straightened up around the house, picked up her daughter from school and wrote poetry. (R. at 377, 383-84.) In Daily Activity Questionnaires dated May 16, 2003, and July 10, 2003, Jackson reported taking her daughter to school, making beds, washing dishes, straightening the house, sometimes doing laundry, picking up her daughter from school and preparing daily meals. (R. at 95, 111, 115.) She stated that she required assistance driving long distances. (R. at 95, 109.) Jackson stated that she went grocery shopping weekly with her daughter's help. (R. at 97, 115.) She stated that

-16-

she watched television and listened to the radio daily. (R. at 99-100, 110.) Jackson stated that she wrote poetry and read good books for a total of three to four hours per day. (R. at 117.) She stated that she visited and received visits from family and friends and talked with them on the telephone. (R. at 100, 118.) Jackson described herself as a "people person," noting that she got along with everyone. (R. at 100.) She stated that her daughter was dependent on her for everything. (R. at 100, 118.) Jackson further reported attending her daughter's school functions, including choir concerts, every two or three months. (R. at 100-01.) She stated that she required no assistance with personal care. (R. at 102, 120.)

Given the essentially mild findings on physical examinations and based on the objective medical evidence of record, along with the findings of the state agency physicians, Jackson's improvement with medications and treatment and her reported activities of daily living, I find that substantial evidence supports the ALJ's physical residual functional capacity finding.

Jackson also argues that the ALJ erred in his residual functional capacity finding by dismissing her psychological complaints. (Plaintiff's Brief at 6-7.) Based on my review, I find that substantial evidence exists in this record to support the ALJ's finding that Jackson did not suffer from a severe mental impairment. The record reveals that Jackson was referred to Mount Rogers on July 20, 2000. (R. at 293.) She was prescribed Zoloft at that time. (R. at 293.) On October 18, 2001, she reported "much less depression" to Dr. Joiner. (R. at 199.) The next evidence regarding Jackson's mental health is dated July 23, 2003, nearly two years later, when state agency psychologist Tenison concluded that Jackson suffered from a nonsevere

-17-

affective disorder, specifically, depression and anxiety secondary to pain. (R. at 223.) He further concluded that Jackson was only mildly restricted in her activities of daily living, experienced no to mild difficulties in maintaining social functioning, experienced mild difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 230.) Tenison noted that Jackson had only a mild degree of depression and anxiety due to chronic pain. (R. at 232.) However, he further noted that she had received no mental health treatment and that her activities of daily living were primarily restricted by physical pain. (R. at 232.) In October 2003, Jackson informed Brock Hughes Free Clinic, ("Brock Hughes"), that she had never gone to Mount Rogers Mental Health Center, ("Mount Rogers"). (R. at 290.) She was diagnosed with depression and was prescribed Prozac, which "help[ed] a little." (R. at 289-90.) Nonetheless, she noted crying spells, difficulty sleeping and anxiety attacks. (R. at 289.) She was again diagnosed with depression, continued on Prozac and was prescribed Vistaril. (R. at 289.) On December 18, 2003, Jackson reported feeling "jittery." (R. at 287.) Her dosage of Prozac was increased. (R. at 287.) On February 4, 2004, Jackson noted less depression, but increased anger. (R. at 286.)

On January 5, 2004, Jackson was seen at Mount Rogers seeking counseling. (R. at 276-85.) A licensed clinical social worker diagnosed Jackson with major depressive disorder, recurrent, severe, with unspecified paranoia and a then-current Global Assessment of Functioning, ("GAF"), score of 35.[3] (R. at 283.) On January

_____

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31 to 40 indicates "[s]ome impairment in

16, 2004, Jackson began seeing a student intern at Mount Rogers for individual therapy. (R. at 275.) Her GAF was rated as 40. (R. at 275.) Jackson continued in therapy through March 4, 2004. (R. at 272-74, 332.) Her condition remained unchanged over this time period. (R. at 272-74, 332.)

As the Commissioner notes in her brief, the sources at Mount Rogers and Brock Hughes are not considered "acceptable medical sources" under the regulations. The record reveals that Jackson saw a licensed clinical social worker, a student intern and a family nurse practitioner regarding her mental health. These sources are not considered acceptable medical sources under the regulations. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (2005). Therefore, this evidence will not be considered in determining whether the ALJ's mental residual functional capacity assessment, or lack thereof, is supported by substantial evidence.

Jackson has presented additional evidence from Cathye Griffin Betzel, Psy.D., a licensed clinical psychologist, relating to her mental condition to this court for review in making its determination. A district court may order additional evidence to be taken before the Commissioner only when there has been a showing that there is "new evidence," which is material and that there exists good cause for the party's failure to incorporate the evidence into the record in a prior proceeding. *See* 42 U.S.C.A. § 405(g) (West 2003 & Supp. 2005). Thus, the additional evidence must be new, material and relate to the period on or before the date of the ALJ's decision. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 95-95 (4th Cir.

---

reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. ..." DSM-IV at 32.

-19-

1991). "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins*, 953 F.2d at 96 (citations omitted).

The ALJ's decision in this case was dated April 30, 2004, and psychologist Betzel's evaluation was not completed until November 30, 2004, exactly seven months later. The Appeals Council denied Jackson's request for review on August 30, 2004, exactly three months prior to Betzel's evaluation. Thus, I find that Betzel's evaluation is not relevant to the time period on or before the ALJ's decision.

I note that in addition to this evidence not relating to the time period on or before the date of the ALJ's decision, Jackson also has failed to show good cause for failing to obtain and incorporate such evidence into an earlier proceeding. She has offered no reason why such a consultative examination could not have been obtained at an earlier date. Because the evidence does not relate to the relevant time period and due to Jackson's failure to show good cause, I will not address its materiality. For these reasons, I find that this court need not consider Betzel's evaluation in making its determination.

Given the minimal findings regarding Jackson's mental status from the acceptable medical sources, along with her activities of daily living, including writing poetry and reading good books, I find that substantial evidence supports the ALJ's mental residual functional capacity finding, or lack thereof.

*III. Conclusion*

-20-

For the foregoing reasons, the plaintiff's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the Commissioner's decision denying benefits will be affirmed.

I further deny Jackson's request to present oral argument based on my finding that the parties have more than adequately addressed the relevant issues in their written arguments.

An appropriate order will be entered.

DATED:      This 23rd day of August, 2005.


/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE